IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Anthony James Moore, | ) | **ORDER DENYING PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY** |
| Plaintiff, | ) | **JUDGMENT AND GRANTING** |
| | ) | **DEFENDANT'S MOTION FOR** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Timothy Schuetzle, in his individual and | ) | |
| official capacities, | ) | Case No. 1:06-cv-079 |
| | ) | |
| Defendant. | ) | |

Before the Court are (1) Plaintiff Anthony James Moore's Motion for Summary Judgment filed on December 19, 2006; and (2) Defendant Timothy Schuetzle's Motion for Summary Judgment filed on April 19, 2007. A response to the Plaintiff's motion was filed by Schuetzle on April 13, 2007, and a response to the Defendant's motion was filed by Moore on April 24, 2007. For the reasons set forth below, the Defendant's motion for summary judgment is granted and the Plaintiff's motion for summary judgment is denied.

I.      **BACKGROUND**

The plaintiff, Anthony James Moore, is an inmate at the North Dakota State Penitentiary (NDSP) in Bismarck, North Dakota. On October 2, 2006, Moore filed a pro se complaint alleging that the Warden of the North Dakota State Penitentiary, Timothy Schuetzle, and the Fargo Police Department had violated his civil rights pursuant to 42 U.S.C. § 1983. See Docket No. 2. On October 10, 2006, Moore filed an amended complaint and sought to include a claim against an agent of the North Dakota Bureau of Criminal Investigation (BCI). See Docket No. 3. On November 13, 2006, Moore sought to again amend the complaint to add another claim against Schuetzle for

opening Moore's legal mail and to bring a new claim against the United States Postal Service.  See Docket No. 16.  The Court severed the two claims against the BCI agent and the Fargo Police Department, denied the motion to amend the complaint to join the United States Postal Service as a defendant, and granted the motion to bring a fourth claim against Schuetzle.  See Docket No. 26. On December 19, 2006, Moore filed a second amended complaint along with a motion for summary judgment.  See Docket Nos. 33 and 34.  On April 19, 2006, the Defendant filed a motion for summary judgment and on April 20, 2007 filed an amended motion for summary judgment.  See Docket Nos. 65 and 70.

### A.    AN OVERVIEW OF GRIEVANCE PROCEDURE

The Department of Corrections has issued an Inmate Handbook to each inmate at the North Dakota State Penitentiary.  See Docket No. 61-1, ¶ 5.  The Inmate Handbook provides the procedures that an inmate must follow to file a grievance.  See Docket No. 61-22.  The procedures require an inmate to initially attempt to resolve the grievance informally by talking to the individual or individuals who are the subject of the grievance or control the remedy for the grievance.  If the attempt to informally resolve the problem is not successful, the inmate can file a "Step One Grievance" within fifteen (15) days of the alleged incident.  The grievance form is submitted to the inmate's case manager who investigates the grievance and responds to the inmate.  If the inmate is not satisfied with the response from the case manager, the inmate can appeal to the warden in a "Step Two Grievance."  If the inmate is not satisfied with the warden's response, the inmate may appeal to the Director of the Department of Corrections and Rehabilitation.

2

The grievance procedure also provides that a grievance may be submitted directly to the director of the Department of Corrections and Rehabilitation if the grievance is of a particularly sensitive nature or may cause the inmate to fear possible adverse effects if it is known in the institution that the inmate filed the grievance.  On March 14, 2003, Warden Schuetzle restricted Moore's future use of the grievance process by limiting him to the filing of one grievance per week. See Docket No. 61-2.

### B.   MOORE'S CLAIMS

Moore has alleged four claims: (1) that his confinement in administrative segregation violates his Eighth Amendment rights; (2) that prison officials have used excessive force in violation of his Eighth Amendment rights; (3) that prison officials have retaliated against him for participating in the prisoner grievance system; and (4) that prison officials have opened his legal mail outside of his presence.  Each claim will be addressed in turn.

### 1)   ADMINISTRATIVE SEGREGATION

Moore was placed at the North Dakota State Penitentiary on January 29, 2002, as a result of a state conviction of gross sexual imposition, with force.  See Docket No. 61.  Since his arrival at the NDSP, Moore has been a difficult prisoner and has been placed in administrative segregation on nine separate occasions because of his inability to control his behavior.  Id. ¶ 4.  On September 22, 2006, Moore was placed in administrative segregation and has remained there since September 2006, because of his apparent inability to satisfy the behavior requirements for his return to the general population.

In his affidavit, Moore provides that he "is currently in tremendous Pain and suffering in my knees.  pain in back and In entire physical body."  See Docket No. 64 (errors in original).  Moore contends that he has "Degenerated and deteriorated physically due to Being in administrative segregation inactive 23 Hours out of a 24 hour period day."  Id. (errors in original).

On October 9, 2006, Moore was disciplined for writing a sexually harassing letter to a female correction officer.  See Docket No. 61-16.  Moore appealed the disciplinary action to the warden by filing a "Step Two Grievance."  In his grievance, Moore made no mention of the underlying offense or sanction, but instead complained of his placement in administrative segregation.  Moore wrote that his placement in administrative segregation "causes physical pain, suffering and degeneration and deterioration being inactive 23 hours out of a 24 hour period day."  Id.  In addition, Moore stated "[t]hese are atypical and significant hardship in relation to the ordinary incidents of the prisoner's life."  Id.

On October 26, 2006, Moore sent a letter to Leann Bertsch, the Director of the Department of Corrections and Rehabilitation, requesting that he be released from administrative segregation.  See Docket No. 61-3.  In his letter, Moore stated that "[w]hile in Administrative Segregation Department prisoners obviously degenerate and deteriorate physically and mentally and suffer in tremendous daily pain from being inactive 23 hours out of a 24 hour period day."  Id.

On October 30, 2006, Director Bertsch responded and stated that Moore would be reviewed for release from administrative segregation in accordance with prison policies.  Id. at 4.  After receiving the denial, Moore chose to bypass the grievance procedure and again sent a grievance directly to Director Bertsch claiming that, because it was a sensitive nature, he could not go through the regular procedures.  Id. at 5.  In this grievance, Moore again stated that prisoners, "while in

4

administrative segregation degenerate and deteriorate physically, mentally, emotionally and suffer in pain being inactive 23 hours out of a 24 hour period day." Id. Director Bertsch rejected Moore's attempt to bypass the grievance procedures, noting that the subject of the grievance was not of a sensitive nature and she did not believe the "issue would cause adverse results if known in the institution and do not find that it is necessary to file directly to me." Id. at 6.

Inmates placed in administrative segregation receive one hour per day of outdoor recreation for five days per week. See Docket No. 68, ¶ 4. In addition, Moore can leave his cell to take three 15-minute showers per week, to meet with the law librarian on the administrative segregation unit, to go to the infirmary for medical treatment, to make telephone calls, and to have his hair cut. Id. at ¶ 9. Many inmates housed in administrative segregation spend a number of hours per day exercising, including yoga, jumping jacks, sit-ups, weight lifting (using books as weights), and running in place. Id. at ¶ 8.


### 2)      EXCESSIVE FORCE

Moore contends that the correctional officers at the NDSP have used excessive force when applying and removing handcuffs. Moore states that when the "employees escort the plaintiff anywhere they purposely place and remove the handcuffs as an attempt to break the plaintiffs wrist that v causes serious injury and sever pain and suffering, ... that the plaintiffs wrist have been seriously injured and are in severe pain." See Docket No. 35 (errors in original). Moore further provides:

> the plaintiff has complained to the north dakota state penitentiary administrative segregation employees and officials of the administrative segregation employees attempting to break his wrist upon the placement and removal of handcuffs on or off

5

the plaintiff that have they have done absolutely nothing about the complaints from the palintiff or of the complaint and documentation of pain and suffering.

Id.  (errors in original).

On March 13, 2006, Moore filed a grievance claiming that two correctional officers used excessive force in removing his handcuffs through the slot in his administrative segregation cell door.[1]  See Docket No. 61-4.  In the response to Moore's "Step One Grievance," Moore was informed that the officers had placed the cuffs on with the key holes facing up the arm, which is standard procedure for transports.  Id.  Because the key holes faced up the arm, the officers had to twist the cuffs to reach the key hole.  Id.  Moore failed to report this injury to the officer working that day or to the medical staff who were on the unit and saw him that day.  Id.

On March 20, 2006, Moore filed another grievance in which he claimed the staff used excessive force.  See Docket No. 61-5.  Moore contends that correctional officer Jason Banks "caused excruciating pain as he removed handcuffs through the cell slot door.  He continued to grab my wrist after my cuffs were removed and would not allow or let my right hand go until he was finished inflicting terrible pain."  Id.  Moore contends that Banks attempted to break his wrist by twisting it.  Id.  Moore then filed an inmate request to see a doctor and claimed that it felt like his right hand was broken.  See Docket No. 61-6.  Moore was allowed to see a doctor and the doctor examined and took an x-ray of Moore's right hand.  The doctor concluded that there was "[n]o significant change in bone, joint or soft tissue."  Id.

---

[1]  Handcuffs for inmates in administrative segregation are usually removed when returning to their cells in a "cage" on the tier.  However, handcuffs are removed through the door slot when inmates are first brought to administrative segregation and when they are being disruptive.  See Docket No. 61.

3)      **RETALIATION**

a.      **TAGHON INCIDENT REPORTS**

On October 11, 2005, Beth Taghon, a nurse at the North Dakota State Penitentiary, filed an incident report against Moore for insolence to a staff member.  <u>See</u> Docket No. 61-8.  The incident report claimed that Moore had filed a complaint with the North Dakota Board of Nursing and described Taghon as "a wicked low down conniving spiteful wench."  <u>Id.</u>  In his complaint, Moore has alleged that Taghon refused to provide medical care to prisoners who need the care.  <u>See</u> Docket No. 61-7.

Moore does not claim that Taghon has refused to provide him with medical care.  Instead, Moore claims that Taghon refuses to give prisoners who seek help any assistance and does so with a "hateful and demeaning tone and action."  <u>Id.</u>  Moore also claims that Taghon is a "compulsive, impulsive, habitual pathological liar."  <u>Id.</u>  Finally, Moore claims that Taghon gave an inmate the wrong medication and thought it was funny, has failed to provide an inmate with prescribed medication, and that Taghon will tell an inmate that she will put his name on doctor call, but does not do it.  <u>Id.</u>

The disciplinary committee found Moore guilty of insolence to a staff member for filing insolent statements about Taghon.  <u>See</u> Docket No. 61-8.  Moore appealed to Warden Schuetzle, claiming that it was issued in retaliation for exercising his rights to file a "Step One Grievance" against Taghon.  Warden Schuetzle denied the appeal on the grounds that Moore's allegations were fabricated.  Moore then appealed the "Step Two Grievance" to Director Bertsch.  In denying the appeal, Bertsch stated that "[Moore] sent a complaint to the Board of Nursing in which you made false, misrepresentative, and defamatory statements about a Penitentiary nurse."  <u>Id.</u>  Bertsch also

denied that the "proceedings were retaliatory" and stated that "[i]t is not retaliatory to discipline an inmate for an actual violation of Penitentiary rules."  Id.

On January 9, 2006, Moore sent another complaint to the Board of Nursing concerning Taghon.  See Docket No. 61-9.  In his complaint, Moore alleged that Taghon does not wash her hands after using the bathroom, and graphically complained of Taghon's sanitary habits.  Moore also alleged that Taghon made crude sexual comments and that she has performed various sexual acts with prisoners and colleagues.[2]  Id.  Moore does not claim that he has personal knowledge of these actions.

On January 26, 2006, Warden Schuetzle issued an incident report against Moore based on the content of Moore's complaint to the Board of Nursing about Taghon.  See Docket No. 61-10. In the incident report, Schuetzle states that Moore has no corroborating evidence for any of his allegations, and that Moore filed the complaint in retaliation for Taghon filing an earlier incident report against Moore on October 9, 2005.  See Docket No. 61-10.  Moore refused to discuss the report with the investigating captain and refused to appear at the disciplinary hearing.  The disciplinary committee found Moore guilty of sexual harassment toward Taghon.

Moore appealed the finding, and his appeal was reviewed by the acting deputy warden of operations because Warden Schuetzle had issued the incident report.  In his appeal, Moore alleged that Warden Schuetzle issued the incident report in retaliation for Moore exercising a constitutional right to file a complaint against the nurse.  The acting deputy warden responded to the appeal and agreed that Moore has a right to file a complaint against staff but denied that Moore has "the right

---

[2]  Moore alleges in his complaint that "Taghon has performed fellatio on numerous male prisoners and stating to male prisoners would you like a wet screw.  My cherry needs to be popped.  Super put it in the hooper." See Docket No. 61-9.

8

to lie & slander in that complaint." Id.  The acting deputy warden stated, "In reading your complaint I feel that is just what you have done is sexually harass Nurse Beth.  You have made unfounded claims to a professional Board." Id.  Moore appealed the acting deputy warden's decision, and on February 22, 2006, Director Bertsch denied his appeal and stated "[y]ou have no constitutional right to lie and defame staff." Id.

### b.   KLIMPEL INCIDENT REPORT

On November 21, 2005, Moore filed a grievance against officer Darcy Klimpel claiming that Klimpel antagonized and provoked Moore by following him into the men's bathroom "every time that he sees me." See Docket No. 61-11, p. 4.  Moore claimed that Klimpel just "stares" at him. Id. In the grievance form, Moore states "[r]emedy requesting is no assault charges, at the Burleigh County District Court for any actions from me are clearly out of self defense, and not those of the agressor (sic)." Id.

Klimpel contends that "Moore is not accurately describing the incident." See Docket No. 61-11, p. 4.  In his response to the "Step One Grievance," Klimpel explained that the single incident occurred approximately three weeks prior to the complaint and that he had been doing rounds and had walked into the women's bathroom.[3]  After Klimpel walked into the women's bathroom, Klimpel stated that Moore suddenly looked out of the stall "in a quick manner." Id.  Klimpel stated that he found this unusual and stated that "Moore then began to stare at me trying to use psychological intimidation." Id.  Klimpel stated that he twice asked if he could help Moore with anything.

---

[3]  Women are no longer confined at the North Dakota State Penitentiary but the bathroom is still known as the "women's" bathroom.

On November 22, 2005, Moore appealed the grievance to Warden Schuetzle and again requested the remedy that no charges be brought against him for a future assault on Klimpel. Schuetzle responded by stating that Klimpel was performing his security duties by checking the rest rooms and by reminding Moore that he is "on a behavior contract, recently out of AS, and require (sic) careful supervision."  Id.

On November 23, 2005, Klimpel filed an incident report charging Moore with "threat to a staff member" for the statements Moore made in his grievance about a future assault.  See Docket No. 61-12.  Moore refused to attend the adjustment committee hearing.  Id. at 4.  Moore was found guilty of the charge and appealed the decision to Warden Schuetzle claiming that Klimpel's filing of the incident report was done in retaliation for Moore's filing of a grievance against Klimpel, which was a protected constitutional right.  Id. at 3.  Moore also stated that the incident report must be dismissed and Klimpel reprimanded.  Schuetzle responded that the report was not in retaliation, "but [was] for the language and threats [Moore] made in the grievance."  Id.  Schuetzle also stated:

> You retain the right to file grievances, but these must be addressed in a respectful, honest manner, without name calling or threats.  The grievance process is not intended to be used by inmates as a way to take "free shots" at staff under the guise of your 1st Amendment right of free speech.

Id.

On December 2, 2005, Moore appealed Warden Schuetzle's decision to Director Bertsch. Bertsch denied Moore's appeal and stated "[t]he fact that you call a threat a grievance does not mean that you did not make the threat.  When considering the number of class A incident reports in your institutional record, your statement is appropriately considered a threat."  Id. at 1.

10

c.      **SAYLER INCIDENT REPORT**

On January 9, 2006, officer James Sayler filed a minor rule infraction report against Moore for failing to obey orders.  See Docket No. 61-14, p. 8.  The report indicates that Moore attempted to remove tape and toilet paper from the trash in the infirmary and bring them to his cell.  Dr. Hagan and officer Sayler repeatedly instructed Moore that he could not have the tape but Moore continued to walk out of the doctor's office.  Moore ultimately complied with Sayler's order after attempting to "stare" Sayler down and calling him a "weak minded individual."  Id.

On January 16, 2006, Moore filed a "Step One Grievance" against officer James Sayler.  Id. at 7.  In his grievance form, Moore stated:

> Sayler asked me can he please perform fellatio on me and said to me, do not tell anyone that I asked you this, keep it between us, then he continued to ask me do I have more than 6 inches of cock, then Mr. Saylor (sic) rubbed on my penis and said to me oooh, I know you do, dam you, dam you, you negro buck.

Id.  On January 17, 2006, Case Manager Steven Foster responded to Moore that he would not allow him to file frivolous grievances against staff.  Foster also told Moore that if he did not provide some specifics about the incident and the evidence of its occurrence, that Foster would file an incident report against Moore.

Moore did not respond to Foster's request for information about the incident.  On January 24, 2006, Foster went to see Moore and asked where the alleged incident took place.  See Docket No. 61-14, p. 3.  Moore claimed the incident occurred at the infirmary while Moore was visiting the doctor.  Moore contends that Foster never spoke to him on January 24, 2006.  See Docket No. 35. Foster questioned the staff who were present as well as two inmates whose cells were within hearing distance to where the alleged incident took place.  All parties questioned said that they neither heard nor saw any inappropriate behavior by Sayler towards Moore.  During the course of his investigation,

11

Foster learned that Moore had become upset with Dr. Hagan and Sayler earlier in the week and that Moore had "tried to intimidate officer Sayler before finally complying with the order" to discard tape that Moore was not allowed to have.  Id.  Foster found that the "grievance [was] clearly in retaliation for receiving a report from COII Sayler and is designed to intimidate, embarras (sic) and harass the officer."  Id.

On January 28, 2006, Foster filed an incident report charging Moore with (1) making a threat to a staff member; (2) sexual harassment; and (3) false testimony presented to staff.  Moore refused to attend the adjustment committee hearing and was found guilty of all three charges.   Warden Schuetzle and Director Bertsch denied Moore's appeals.  Warden Schuetzle found that Moore's grievance was not filed in good faith and that it was done to humiliate the staff.  In the denial of Moore's appeal, Warden Schuetzle said "I also believe you derive perverse pleasure from writing these fantasies.  You need to learn that we won't tolerate mean-spirited, insolent and sexually graphic unfounded accusations in the grievance process."  Id.

### d.    VOEGELE INCIDENT REPORT

Moore contends that the fourth instance of retaliation was by Warden Schuetzle for Moore's filing of a grievance against Schuetzle directly with Director Bertsch.  See Docket No. 34, p. 4.  On August 22, 2006, Moore bypassed the grievance procedure and submitted a grievance directly to Director Bertsch.  See Docket No. 33-19.  In his summary of the grievance, Moore wrote:

> Against Timothy Schuetzle for instructing and directing all subordinates not to respond to any grievances that I submit.  This grievance is of a very sensitive nature and I fear possible adverse effects for it is known at the institution.

Id.  On September 19, 2006, Director Bertsch returned the grievance form to Moore and stated that it was not necessary to file the grievance directly to Bertsch and bypass the established grievance

procedure.  See Docket No. 33-20.  Moore contends that Warden Schuetzle retaliated against him for filing this grievance with Bertsch and by subsequently placing Moore in administrative segregation on September 26, 2006.  See Docket No. 34, p. 4.

On September 21, 2006, Moore wrote a lengthy letter to a female correctional officer, Marie Voegele, in which he asked her to arrange to meet him privately, where no one would detect them. See Docket No. 61-15.  Moore described the purpose of the meeting as follows: "It is to hug you, to put my arms around you hold you closely a mature sophisticated full grown woman.  I think that you can handle this gentle affectionate embrace and ripe expressing of a strong desire for something." Id.  Moore also said that "there is no other woman that I desire and want to hug except you."  Id. Moore told Voegele not to show the letter to anyone else because he would probably get in trouble and that she might also.  Id.

On September 22, 2006, Voegele filed an incident report against Moore for handing her the letter soliciting a private meeting.  See Docket No. 61-16, p. 10.  In the report Voegele states that she tried to refuse the note and Moore insisted that she take the note and said that "it's not bad" and that she was "not to tell anyone."  Id.  Moore admitted that he gave the note to Voegele and did not consider the letter to be significant because he thought "she was mature enough that I could write to her about anything."  Id. at 13.

On September 25, 2006, the adjustment committee found Moore guilty of sexual harassment and disorderly conduct.  Id. at 12.  On September 26, 2006, Warden Schuetzle approved the adjustment committee's decision and placed Moore in administrative segregation.  Moore then filed an appeal of the adjustment committee's finding to the warden.  Id. at 9.  On September 27, 2006, Warden Schuetzle denied Moore's appeal and noted that it was Moore's fourth incident report for sexual harassment "only this time you weren't making inappropriate sexual comments to or about

13

staff, you were trying to solicit sexual contact with female staff." Id. Warden Schuetzle further noted that "[g]iven your crime [GSI with force], I view this as even (sic) more serious offense . . . I believe that this behavior is a serious threat to facility security and to staff safety." Id.

Moore appealed Warden Schuetzle's decision to Director Bertsch. After consultation with the department's legal counsel, Bertsch returned the incident report to the adjustment committee for a rehearing to address the charge of "disorderly conduct," with instructions to either dismiss the charge or state findings of fact. Moore was given a new hearing at which he again admitted that he wrote Voegele the letter and stated that he believed that she was a "mature, sophisticated woman," to whom he could write about anything. Id. The adjustment committee found that Moore had written the letter and that it constituted sexual harassment. The committee further found that Moore's repeated insistance that Voegele take the letter constituted disorderly conduct.

Moore again appealed the committee's decision and Warden Schuetzle and Director Bertsch upheld the decision. In his appeal, Moore states: "the decision by Warden Timothy Schuetzle to place me into administrative segregation is done out of sheer retaliation against me for filing and submitting a grievance to the director of corrections and rehabilitation Leann K. Bertsch against Warden Timothy Schuetzle." Id. at 2. Essentially, Moore contends that his placement in administrative segregation on September 26, 2006, was made by Warden Schuetzle in retaliation for an earlier grievance against the warden that Moore filed directly with Director Bertsch on August 22, 2006. To support his contention, Moore goes on to state: "[t]here is absolutely no evidence of any sexual harassment or let along any disorderly conduct as charged in the unnecessary class A incident report." Id.

14

### 4)      BACKGROUND CONCERNING MOORE'S LEGAL MAIL

Moore also alleges that officials at the NDSP opened his legal mail on five separate occasions. Moore contends that penitentiary officials opened his mail outside of his presence on August 10, 2005, and October 30, 2006. See Docket No. 34, p. 5. Moore also contends that penitentiary officials opened his mail outside of his presence on three occasions by "tearing into the legal mail envelopes to see what the contents says (sic) then claiming falsely that the legal envelopes arrived torn." Id. Moore contends that these instances occurred on March 10, 2006, March 13, 2006, and April 21, 2006.

### a.      OPENED MAIL

On August 22, 2005, Moore filed a "Step One Grievance" claiming that his legal mail had been opened outside his presence. See Docket No. 61-18, p. 4. In his grievance, Moore asserts that "[o]n August 10 2005, my incoming privileged mail was opened outside my presence." The record reveals that the letter was from the judge's chambers for the Cass County District Court in North Dakota. Id. at 5. Moore's requested remedy for this instance was that he be given "Flagyl 500 milligrams (sic) for 7 days 3 times a day, or one thousand dollars to be added to my spending account today." Id. The Administrative Services Manager, Denise Senger, responded to the grievance and provided: "After investigating this, it was found that you did receive the letter opened. I sincerely apologize for this. We receive a large amount of mail and are very careful this does not happen." Id. On September 1, 2005, Moore filed a "Step Two Grievance" that was denied by Warden Schuetzle. Id. at 3. On September 16, 2005, Moore filed an appeal to Director Bertsch.

Director Bertsch responded that she was unable to comment on Moore's allegations because there is litigation pending on the matter.  Id. at 1.[4]

On November 6, 2006, Moore filed a "Step One Grievance" against the penitentiary "for opening my legal mail outside of my presence on October 30 2006."  See Docket No. 61-19.  Moore contends that the letter was from the United States Department of Justice, Federal Bureau of Investigation.  As a remedy, Moore requests that "500 dollars be added to my spending account or cancel and pay debt that I owe to the penitentiary and federal court."  Id.  The case manager responded to the grievance and provided that the "letter was opened by accident in the business office, as it is marked on the letter.  This happens occasionally and was not intentional.  We will not put money in your account for an accident that did not harm you."  Id.

At the North Dakota State Penitentiary, the mail is sorted by destination, for example, the Business Office, Warden's Office, Deputy Warden, File Room, Personnel Office, etc.  See Docket No. 61, ¶ 27.  The staff mail is then distributed to the appropriate place and inmate mail remains in the mail room to be sorted and either opened and checked for contraband or recorded and delivered to the inmate.  Warden Schuetzle contends that Moore's October 30, 2006, letter was accidentally delivered to the Business Office and was opened by the Business Office without looking at the addressee.

---

[4]At the time Moore appealed the denial of the "Step Two Grievance" to Director Bertsch, Moore had begun litigation against officials for the Department of Corrections and Rehabilitation, including a claim concerning improper opening of his legal mail.  See Moore v. Schuetzle, Case No. 1:05-cv-098 (D.N.D.).

16

           **b.**      <u>**TORN MAIL**</u>

Moore contends that he received mail on three occasions that had "a whole (sic) torn ib (sic) the legal envelope large enough to see what the inside cintents (sic) say." <u>See</u> Docket No. 34, p. 6. On April 3, 2006, Moore filed a "Step One Grievance" in which he contends that his mail was opened outside of his presence on two occasions: March 10, 2006, and March 13, 2006. <u>See</u> Docket No. 61-20, p. 4. Administrative Services Manager, Denise Senger, responded providing: "[y]our legal mail was not opened and the officer verified that it wasn't." <u>Id.</u> Moore's subsequent appeals were denied. In the denial of the appeal by Director Bertsch, Bertsch notes that the envelope had been received damaged and that it was marked as having been damaged.

On April 24, 2006, Moored file a "Step One Grievance" again contending that "[l]egal and privilege (sic) correspondence opened outside of my presence on April 21, 2006." <u>See</u> Docket No. 61-21. In response to this grievance, Senger stated: "[t]he legal letter was not opened outside your presence. It was received with the corner torn. The mail clerks ran a copy of your legal letter when they received it to verify that it was not opened outside your presence." <u>Id.</u> On April 26, 2006, Moored filed a "Step Two Grievance" concerning the torn envelope. <u>Id.</u> at 3. That same day, acting warden Patrick Branson denied the appeal and provided the response as follows:

> Every staff member involved with this letter/envelope agrees the corner was torn and a very small section of the contents exposed. This occurred in delivery to our facility by the mail carrier. The mail clerk immediately photo copied the torn envelope when it was received. There was nothing we could do and nothing our staff did to tear the envelope.

<u>Id.</u> Moore appealed this grievance to Director Bertsch and his appeal was denied for the same reasons provided in response to his original grievances. <u>Id.</u> at 1.

17

II.   **STANDARD OF REVIEW**

It is well-established that summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Clark v. Kellogg Co., 205 F.3d 1079, 1082 (8th Cir. 2000).  A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact.  If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings.  Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial.  Fed.R.Civ.P. 56(e); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003).  A mere trace of evidence supporting the non-movant's position is insufficient.  A non-movant must present more than a scintilla of evidence and must present specific facts to create a genuine issue of material fact for trial.  F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir.1997). The facts must generate evidence from which a jury could reasonably find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

III.   **LEGAL DISCUSSION**

   A.   **REQUESTED RELIEF**

As a remedy for the alleged constitutional violations, Moore's only request is that he be transferred to a federal prison under the jurisdiction of the Federal Bureau of Prisons.[5]  See Docket No. 63, p.6.  Moore cites to the Eighth Circuit decision in Haley v. Dormire, 845 F.2d 1488 (8th Cir. 1989), as authority for the proposition that the Court has the authority to transfer Moore into federal custody.

In Haley, a *pro se* inmate initiated a civil rights actions alleging, *inter alia*, that prison officials had conspired to keep the inmate confined to the prison's special management facility.  See 845 F.2d 1488, 1489.  Haley sought declaratory and injunctive relief, including a transfer to another prison.  Following an initial review of the inmate's complaint, the district court dismissed his claims on the grounds that they were frivolous.  Id. at 1489-1490.  On appeal, the Eighth Circuit concluded that the inmate's claims were not legally frivolous and remanded the matter back to the district court for further proceedings.  The Eighth Circuit also denied without prejudice a motion by the inmate for transfer to federal custody, the presumable basis being that the request for such a transfer was made in the first instance on appeal, but stated that the inmate "may wish to file this motion in the

_____

[5]  In his original complaint, Moore's requested relief was "a court order that the plaintiff be transferred into federal custody immediately to do the remainder of his prison sentence and never to return to the North Dakota State Penitentiary ever again."  See Docket No. 2-2, p. 13.  Before the Court could complete the screening, Moore again amended his complaint, but sought the same relief.  See Docket No. 9, p. 15.  In addressing Moore's first motion to amend his complaint, Magistrate Judge Charles S. Miller Jr. noted that the Court does not have the power to grant the relief that Moore has requested.  See Docket No. 7, p. 14.  Judge Miller ordered that Moore be given an opportunity to supplement his amended complaint by requesting additional relief and warned Moore that his claims may be subject to dismissal as frivolous if he failed to do so.  Id. at 19.

   Moore appealed Judge Miller's order to Chief Judge Hovland, and the appeal was denied.  See Docket No. 26, p. 3.  Following the denial of his appeal, Moore filed a "Document of Clarification" stating that he did not intend to change his request for relief and made clear that the only relief he was seeking in his amended complaint was that he be transferred from state custody to federal custody.  See Docket No. 13-2.

district court." Id.   Seizing upon this language, Moore asserts that the Eighth Circuit has held that such relief can be granted.

The administration of prisons, including particularly state prisons, is generally not within the province of the court, but, in rare and extreme cases, federal courts have ordered a transfer of state prison inmates.   Such was the case in Walker v. Lockhart, 713 F.2d 1378 (8th Cir. 1983). There, an inmate convicted of murdering a Little Rock, Arkansas, policeman requested that he be allowed to serve the remainder of his sentence outside the Arkansas state prison system on account of threats allegedly made against his life by the warden.   The district court rejected his request, leaving the matter of the inmate's safety to the discretion of Arkansas prison officials.   On appeal, the Eighth Circuit concluded there was undisputable evidence of an unusually high risk of physical danger to the inmate.   Consequently, it ordered that the inmate be transferred to a place of incarceration outside of Arkansas in either in a federal or another state's correctional institution.[6]

The Fifth Circuit has also recognized that a transfer of custody can be ordered to ensure an inmate's safety.   In Streeter v. Hopper, 618 F.2d 1178, 1182 (5th Cir. 1980), the Fifth Circuit affirmed a district court's decision to order the transfer of two inmates whose lives were in danger. In ordering the transfer, the district court had based its decision on evidence that placement in the general prison population had put the inmates at grave risk and that their present state facility was

---

[6]  In reversing the decision of the district court, the Eighth Circuit held:
[The inmate's] life is put in danger by his incarceration in the Arkansas general prison population and that [the inmate] has established the right to serve the remainder of his sentence in an institution outside of Arkansas where he will have the same privileges and obligations as other prisoners, but without facing the undue risks and fear for his safety.  Accordingly, we reverse the judgment of the district court denying [the inmate's] section 1983 claim.  We remand this case to the district court for entry of an order in conformity of this opinion directing [the warden] to arrange without undue delay for the transfer of [the inmate] to a place of incarceration outside of Arkansas, either in a federal or other state's correctional institution.
713 F.2d at 1383.

unable to adequately guarantee their safety.  Although it expressed reluctance to interfere in the operation of state prisons, the Fifth Circuit concluded that the transfer of the inmates to another facility was warranted as they were exposed to conditions more dangerous than those of normal prison life.

The fact that this Court may arguably have the power in rare and extreme cases to order state officials to transfer a prisoner does not mean that it has the power and authority to force federal prison officials to <u>accept</u> Moore as a prisoner for service of the remainder of his state sentence.  This issue was addressed directly in the case of <u>Fisher v. Goord</u>, 981 F. Supp. 140 (S.D.N.Y. 1997).  In that case,  the court concluded that federal courts do not have the authority to force federal prison officials to accept state prisoners.  In relevant part, the court stated the following:

> [W]hen a state has primary custodial jurisdiction over an inmate, a federal court cannot order the delivery of the defendant for service of a sentence in a federal institution.  Such an order would be tantamount to a transfer of custody beyond the jurisdiction of the federal court.

981 F. Supp. 140, 177.  In so holding, the court noted that the Eighth Circuit's decision in <u>Walker</u> was not inapposite because in that case the Eighth Circuit's decision that the prisoner be transferred was directed to the state officials who had jurisdiction over the prisoner.

The Court finds, as a matter of law, that it does not have the authority to grant Moore the only relief that he requests in this action - to be transferred to a federal prison facility operated by the Bureau of Prisons.  Moore has failed to produce any evidence that would even remotely suggest that there is any risk of physical danger or threat to his safety that would warrant a transfer of custody as was done in <u>Walker</u> and <u>Streeter</u>.  However, because Moore is a *pro se* litigant, the Court is willing to afford him more latitude and will analyze his claims for possible equitable relief.

### B.    ADMINISTRATIVE SEGREGATION

The Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 . . . until such administrative remedies as are available are exhausted." This applies to all inmates in "any jail, prison, or other correctional facility." 42 U.S.C. § 1997e(a). The Supreme Court has interpreted this section to apply to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). The exhaustion requirement is mandatory. Further, the requirement that all "available" remedies be exhausted requires that prison grievance procedures be completed prior to the filing of any Section 1983 claim. Johnson v. Jones, 340 F.3d 624, 627-628 (8th Cir. 2003); see also Wright v. Morris, 111 F.3d 414, 417 n.3 (6th Cir. 1997) (providing that grievance procedures are not exhausted when an inmate files a grievance but fails to appeal the denial of the grievance to the highest possible administrative level). A failure to exhaust administrative remedies precludes a court from proceeding with the action. Porter v. Nussle, 534 U.S. 516, 529 (2002). If an inmate has not identified that he has exhausted all available remedies before bringing the action, the Court must dismiss the action.

Warden Schuetzle contends that Moore has failed to exhaust his administrative remedies with regard to his claim that the conditions of confinement while in administrative segregation violate his constitutional rights. It is clear from the record that Moore has failed to exhaust the available administrative remedies regarding the conditions of his confinement. Therefore, Moore is precluded from raising those issues in this civil rights action. Moore chose to file his grievance directly with Director Bertsch and he voluntarily chose to bypass the established grievance

22

procedures.  The Court finds that Moore's grievance is not of a sensitive nature despite his statement to the contrary.  However, as discussed below, even if Moore had exhausted the available administrative remedies with regard to the conditions of his confinement (administrative segregation), the Court finds that the conditions do not violate Moore's constitutional rights.

Moore contends that "the north dakota state penitentiary employees and officials are purposely frequently placing the plaintiff into administrative segregation that constitues cruel and unusual punishment because it causes physical degeneration and deterioration tremendous pain in his back knees joints muscle due to being inactive 23 hours out of a 24 hour period."  See Docket No. 34, p. 9 (errors in original).

The Eighth Amendment prohibits the cruel and unusual punishment of inmates by prison officials.  Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001).  A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened."  Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992).  To prevail, an inmate alleging lack of exercise must show that the prison officials "were deliberately indifferent to his exercise needs."  Id. 448-449.  In this regard, courts have held that merely limiting the number of hours an inmate is permitted for exercise, whether outdoor or not, is not unconstitutional per se.  See Peterkin v. Jeffes, 855 F.2d 1021, 1028 (3d Cir. 1988) (holding that two hours per day of outdoor exercise is not considered cruel and unusual punishment); Ruiz v. Estell, 679 F.2d 1115, 1152 (5th Cir. 1982) (holding that daily exercise of one hour per day does not violate the Eighth Amendment).

The Eighth Circuit in Wishon v. Gammon, 978 F.2d 446 (8th Cir. 1992), held that the plaintiff, a prisoner who was permitted only 45 minutes of exercise per week and 30 minutes per week for showers, was not unconstitutionally deprived of out-of-cell exercise time as he could not

23

show that he had suffered any injury or decline in health.  Id. at 448-449; see also Hasona v. Groose, 80 F.3d 298, 306 (8th Cir. 1996) (upholding prison officials limitation on outdoor recreation to three hours of exercise per week in an enclosed area out-of-doors on inmate's failure to show that prison officials were deliberately indifferent to his exercise needs so as to impact his health); McDonald v. Armontrout, 908 F.2d 388, 391-392 (8th Cir. 1990) (holding that limiting outdoor exercise for close custody inmates to four hours per week at a smaller outdoor exercise facility for medium custody inmates without access to basketball, football, or baseball is constitutional).  Further, an inmate who fails to take advantage of the exercise opportunities he is offered is held accountable for any ill effects arising from lack of exercise and cannot shift liability to prison officials.  See Hosna v. Groose, 80 F.3d 298, 306 (8th Cir. 1996).

The record clearly establishes that Moore has been offered one hour of outdoor recreation per day, five days per week.  Moore is also offered three 15-minute showers per week.  He can also leave the cell to meet with the law librarian on the administrative segregation unit, he can go to the infirmary for medical treatment, he can make telephone calls, and/or he can leave to have his hair cut.  Further, Moore has the ability to perform exercises while in his administrative segregation cell as is done by other inmates.

The Court finds, as a matter of law, that the five hours of outdoor exercise time per week available to Moore does not constitute deliberate indifference to his exercise needs in violation of the Eighth Amendment.  Although Moore has claimed that he has suffered detrimental effects from the limited amount of outdoor exercise, even if he were able to prove that a lack of exercise was harmful to him, the Court finds that Moore's failure to take advantage of the other opportunities to

exercise in and out of his cell precludes him from shifting liability for his actions to the defendant.

C.   **EXCESSIVE FORCE**

Moore contends that penitentiary staff used excessive force when transporting him to and from his cell.  Specifically, Moore contends:

> the north dakota state penitentiary emploless in administrative segregation cause excruciating pain upon the plaintiff by the intentional attempts to break the plaintiffs wrist upon the removal and placement of handcuffs on or off the plaintiff that causes excruciating pain and sufering

See Docket No. 34, p. 8 (errors in original).

The Eighth Amendment protects inmates from unnecessary and wanton infliction of pain by correctional officers.  Treats v. Morgan, 308 F.3d 868, 872 (8th Cir. 2002).  Officers are permitted to use force reasonably in a good-faith effort to maintain or restore discipline, as long as they do not use force maliciously and sadistically to cause harm.  In deciding whether a particular use of force was reasonable, the Court must consider whether there was an objective need for force, the relationship between the need and the amount of force used, the threat reasonably perceived by correctional officers, the efforts by the officers to temper the severity of the forceful response, and the extent of the inmate's injuries.

The Supreme Court has held that a court should consider both the "objective" and "subjective" components of an alleged violation when examining an Eighth Amendment claim. Hudson v. McMillian, 503 U.S. 1, 7 (1992).  The objective component relates to the seriousness of the injury.  Not every push or shove that is later proven to be unnecessary constitutes a constitutional violation.  A *de minimus* use of force that is not "repugnant to the conscience of mankind" does not constitute cruel and unusual punishment, even if malicious.  Id. at 9-10.   The

subjective component relates to whether the defendant had a wanton state of mind when engaging in the alleged misconduct.

Moore claims that correctional officers used excessive force in removing his handcuffs on two separate occasions. Moore has failed to provide any objective evidence of any injury stemming from these two instances and he relies solely on very general and conclusory allegations. On March 13, 2006, Moore filed the first grievance alleging excessive force, but did not inform anyone of his alleged injuries. In the response denying the grievance, Moore's case manager pointed out that Moore had not even sought medical attention for the pain that he claimed he suffered. Having been forewarned, the next time Moore filed a grievance of excessive force (on March 20, 2006), he requested to be seen by a physician. The physician's report indicates that x-rays were taken of Moore's hand which revealed neither broken bones nor any soft tissue injury. See Docket No. 61-6.

Moore contends that the physician's report "is misleading because it does and cannot measure and detect pain. It only shows that nothing is broken during March of 2006. Well over a year ago. There is and has been no recent medical evaluation of the Plaintiffs (sic) wrists for the year of 2007." See Docket No. 76, p. 6. Moore further contends that "[t]he x-rays of the plainitffs (sic) hand were taken well before the civil rights action was commenced on March 23, 2006, ... Thus those x-rays are misleading and erroneous and count and amount to as absolutely nothing." See Docket No. 63, p. 2.

Moore has failed to offer any competent medical evidence or lay evidence sufficient to create a genuine issue of material fact on this issue. It is well-settled that conclusory statements alone are insufficient to create a genuine issue of material fact. Doe v. Sauer, 186 F.3d 903, 905-906 (8th Cir. 1999). Further, upon seeking medical treatment, the treating physician concluded that

26

Moore's hand had sustained no injury.  The Court finds that Moore's claim of excessive force in violation of his Eighth Amendment rights fails as a matter of law.  Even if a genuine issue of material fact existed as to Moore's claim of excessive use of force, his claim would still fail.  The only defendant in this civil rights action is Warden Timothy Schuetzle in his official and individual capacities.  Moore does not claim that the warden inflicted pain by applying or removing handcuffs.

The Supreme Court has held that "[r]espondeat superior or vicarious liability will not attach under § 1983."  City of Canton v. Harris, 489 U.S. 378, 385 (1989); see also Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997).  Therefore, there is no factual basis or legal basis for a claim against Warden Schuetzle in his individual capacity.  To hold Warden Schuetzle liable in his official capacity, Moore must establish that a Department of Corrections and Rehabilitation policy caused Moore's alleged constitutional deprivations.  Anderson v. Franklin County, Missouri, 192 F.3d 1125, 1131-1132 (8th Cir. 1999).  Moore has pointed to no policy or custom that caused the alleged deprivation of his constitutional rights.  Further, Moore has not included a claim that Warden Schuetzle is liable for failure to train his staff.  See Vaughn v. Greene County, Arkansas, 438 F.3d 845, 851 (8th Cir. 2006).  Even if Moore had provided evidence sufficient to create a genuine issue of material fact, it is clear and undisputed that Warden Schuetzle is entitled to summary judgment on the claims of excessive use of force.

### D.    RETALIATION

Moore alleges that prison officials impermissibly retaliated against him for exercising his legal rights by issuing incident reports with resulting sanctions.  It is clear that prison officials cannot impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of

his constitutional rights.  <u>Sprouse v. Babcock</u>, 870 F.2d 450, 452 (8th Cir. 1986).  "However, if the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail."  <u>Goff v. Burton</u>, 7 F.3d 734, 738 (8th Cir. 1993).  If the prison officials provide "some evidence" to support the disciplinary action, the inmate will not prevail on his retaliatory claim.  <u>Id.</u> at 739 (providing that the standard of review of a disciplinary committee's determination that a prisoner committed a violation is that "some evidence" exists to support the decision).

### 1)      TAGHON INCIDENT REPORT

Moore contends that he was retaliated against by Warden Schuetzle for filing a complaint against Nurse Taghon with the North Dakota Board of Nursing on January 9, 2006.  <u>See</u> Docket No. 34, p. 3.  In his complaint, Moore made crude sexual comments and accusations about Taghon.  <u>See</u> Docket No. 61-9.  Warden Schuetzle issued an incident report against Moore based on the content of Moore's complaint.  Moore refused to discuss the matter with his case manager and failed to attend the disciplinary hearing.  The disciplinary committee found Moore guilty of sexual harassment, and all of his appeals were denied.  Moore contends that the adjustment committee's decision that Moore was guilty of sexual harassment "is totally unsubstantiated" because Moore did not attend the hearing.

After a thorough review of the record, it is clear that Moore has violated prison rules and regulations by making unsubstantiated allegations about Taghon.  Moore produced no evidence during the course of the investigation into the incident report but now attempts to assert that his refusal to attend the disciplinary hearing resulted in an unsubstantiated decision.  Moore admits that

he wrote and sent the complaint against nurse Taghon to the North Dakota Board of Nursing, and the letter speaks for itself.  Because Moore's claim of retaliatory discipline is based on an actual violation of prison rules and regulations, the claim fails.  The Court finds that Moore's claim of retaliatory discipline as to the Taghon incident report fails as a matter of law because the disciplinary actions taken against Moore were imposed for a violation of prison rules or regulations.

**2)   KLIMPEL INCIDENT REPORT**

Moore also contends that he was retaliated against by Officer Darcy Klimpel by the filing of an incident report in response to a grievance that Moore filed against Klimpel.  On November, 21, 2005, Moore filed a grievance against Klimpel requesting that no assault charges be brought against him for any future assault against Klimpel because they would be "clearly out of self defense, and not those of the agressor (sic)."  See Docket No. 61-11, p. 4.  On November 23, 2006, Klimpel filed an incident report against Moore charging him with "threat to a staff member."  See Docket No. 61-12.  Moore again refused to attend the adjustment committee hearing and was found guilty of the charge.  Warden Schuetzle and Director Bertsch denied Moore's subsequent appeals.  Moore admits that he wrote the grievance against Klimpel, but contends that it is not threatening in nature.

The record overwhelmingly reveals that Moore has violated prison rules and regulations.  Moore was given a disciplinary hearing for his conduct violation but again refused to attend or provide any evidence.  Because Moore's claim of retaliatory discipline is based on an actual violation of prison rules and regulations, the claim fails.  The Court finds that Moore's claim of

29

retaliatory discipline as to the Klimpel incident report fails as a matter of law because the disciplinary actions taken against Moore were imposed for a violation of prison rules or regulations.

### 3)   SAYLER INCIDENT REPORT

Moore contends that case manager Steven Foster retaliated against Moore by the filing of an incident report. See Docket No. 34, p. 2. Moore contends that the reason for the retaliation was that Moore had submitted a grievance against Officer James Sayler. On January 28, 2007, Foster filed an incident report charging Moore with three Class A violations, threat to a staff member, sexual harassment, and false testimony presented to staff. See Docket No. 61-14, p. 3.

It is undisputed that Moore made sexually explicit statements claiming that Sayler had made sexual advances towards Moore that were outlined in the grievance submitted by Moore. See Docket No. 61-14, p. 7. The allegations were thoroughly investigated. It was determined that the statements were fabricated by Moore in an attempt to harass Sayler because of a minor rule infraction report that Sayler had filed against Moore on January 9, 2006. Moore has failed to provide any evidence to substantiate his claim and had difficulty providing details of where the event occurred or who was around at the time. It is clear that Moore's claim of retaliatory discipline is based on an actual violation of prison rules and regulations and, therefore, the claim fails. The Court finds that Moore's claim of retaliatory discipline as to the Sayler incident report fails as a matter of law because the disciplinary actions taken against Moore were imposed for a violation of prison rules or regulations.

### 4)   **VOEGELE INCIDENT REPORT**

Moore's final claim of retaliation is against Warden Schuetzle.  Moore contends that Schuetzle retaliated against Moore by placing him in administrative segregation on September 26, 2006, because Moore filed a grievance against Schuetzle directly with Director Bertsch on August 22, 2006.  However, Moore failed to point out to the Court that on September 21, 2006, Moore wrote a letter to a female correctional officer (Marie Voegele) in which Moore attempted to solicit sexual contact with Voegele.  See Docket No. 61-15.   On September 22, 2006, Voegele filed an incident report against Moore for handing her the letter and charged Moore with disorderly conduct and sexual harassment.  On September 25, 2006, the adjustment committee found Moore guilty of sexual harassment and disorderly conduct.  The record clearly establishes that Moore's misconduct is the reason Warden Schuetzle placed Moore in administrative segregation on September 26, 2006.

The record overwhelmingly reveals that Moore violated prison rules and regulations. Because Moore's claims of retaliatory discipline are based on actual violations of prison rules and regulations, the claims fail.  The Court finds that Moore's claim of retaliatory discipline as to the Voegele incident report fails as a matter of law because the disciplinary actions taken against Moore were imposed for violations of prison rules or regulations.

After an exhaustive review of the entire record and current case law, the Court concludes that Moore's claims of retaliation are based on legitimate disciplinary actions taken against Moore for actual violations of prison rules and regulations.  In essence, Moore seems to confuse retaliation with legitimate disciplinary consequences for his misdeeds.  Moore has failed to state a claim for retaliation and there is no constitutional violation alleged.  The Court finds that Moore's claims of retaliation fail as a matter of law.

E.     **LEGAL MAIL**

It is well-established that inmates have a right to receive mail.  Thornburgh v. Abbott, 490

U.S. 401 (1989).  The United States Supreme Court has held that an inmate's privileged mail may

not be opened for inspections for contraband outside the presence of the inmate and has defined

privileged mail as "mail to or from an inmate's attorney and identified as such."   Wolff v.

McDonnell, 418 U.S. 539, 574, 576-77 (1974); see Cody v. Weber, 256 F.3d 764, 768 (8th Cir.

2002).  The question of whether a particular piece of correspondence is "legal mail" is a question

of law.  See Sallier v. Brooks, 343 F.3d 868, 873 (6th Cir. 2003) (holding that the "determination

of whether particular kinds of correspondence qualify for the constitutional protection accorded a

prisoner's 'legal mail' is a question of law properly decided by the court, not one of fact that can

be submitted to a jury").

In a majority of the Eighth Circuit cases involving inmate complaints concerning "legal

mail" that was opened outside their presence, the mail at issue was correspondence from an attorney

or a "jailhouse lawyer."  See Bear v. Kautzky, 305 F.3d 802, (8th Cir. 2002) (correspondence from

an inmate's "jailhouse lawyer" deemed "legal mail" for purposes of a preliminary injunction); Cody

v. Weber 256 F.3d 764, 767(8th Cir. 2002) (legal papers and letters from his attorneys);  Garnder

v. Howard, 109 F.3d 427, 429 (8th Cir. 1997) (correspondence from the inmate's attorney)

McMaster v. Pung, 984 F.2d 948, 953 (8th Cir. 1993) (mail from an attorney was "legal mail"); see

also, Jensen v. Klecker, 648 F.2d 1179, (8th Cir. 1981) (finding a "letter from the National Prison

Project, bearing the name of an attorney and which was stamped 'Lawyer Client Mail Do Not Open

Except in Presence of Prisoner' and which was addressed to [the inmate]" was legal mail); cf.

Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (holding a package from an inmate's family

member allegedly containing "legal materials" was not considered legal mail); Phelps v. U.S. Federal Government, 15 F.3d 735, 740 (8th Cir. 1994) (holding mail from a law firm not marked private or confidential was not given the protections of "legal mail").[7]

The Eighth Circuit has not explicitly addressed the issue of whether correspondence from other arguably legal sources, i.e. courts, judges, advocacy organizations, or law enforcement officials, is to be considered "legal mail" for the purposes of constitutional protection. However, the Eighth Circuit in Harrod v. Halford, 773 F.2d 234, 236 (8th Cir. 1985), held that " the mere fact that a letter comes from a legal source is insufficient to indicate that it is confidential and requires special treatment." In Harrod, the Eighth Circuit found it permissible for a correctional facility to open letters not properly marked as "confidential" as required by the facility's policy even though the letters were sent by the clerk of the district court, a district judge, a magistrate judge, the United States Department of Justice, the county corrections department, the bureau of community correctional services, and a law firm. Id.[8] Accordingly, the Court must first determine whether the correspondence in question is considered "legal mail."

---

[7]In other Eighth Circuit cases discussing an inmate's "legal mail," the correspondence involved is assumed to be "legal" mail. The cases do not identify the correspondence as being from a lawyer or from another source. Powells v. Minnehaha County Sheriff Department, 198 F.3d 711, 712 (8th Cir. 1999); Waff v. South Dakota Department of Corrections, No. 01-3501, 2002 WL 31641530, at **1 (8th Cir. Nov. 25, 2002) (unpublished); Foster v. Helling, No. 99-4094, 2000 WL 328116 (8th Cir. March 29, 2000) (unpublished); Berry v. Oswalt, No. 96-2184, 1997 WL 22836 (8th Cir. Jan. 23, 1997) (unpublished); Sullivan v. Hill, No. 92-1618EA, 1992 WL 189389 (8th Cir. Aug. 11, 1992) (unpublished); cf. Travis v. Norris, 805 F.2d 806, (8th Cir. 1987) (declining to determine whether a particular piece of correspondence was "legal mail" in light of the fact the correspondence was opened and inspected in the inmate's presence).

[8]Other circuits have taken differing views of what constitutes constitutionally protected "legal mail." See Sallier v. Brooks, 343 F.3d 868 (6th Cir. 2003) (holding that correspondence from the American Bar Association and a clerk of court's office was not legal mail but that correspondence from a court (judge) or an attorney was legal mail); Kennan v. Hall, 83 F.3d 1083 (9th Cir. 1996) (only mail from an inmate's attorney is considered legal mail); Bieregu v. Reno, 59 F.3d 1445 (3d Cir. 1995) (mail from a federal judge, clerk of court, or other courthouse address treated as legal mail); Ramos . Lamm, 639 F.2d 559 (10th Cir. 1980) (holding that mail from counsel, public officials and agencies regarding either civil or criminal matters was legal mail).

1)      **OPENED MAIL**

The record reveals that two pieces of Moore's mail were opened by prison officials.  The first piece of mail was a letter from the Cass County District Court Judge's chambers and was opened on or about August 10, 2005.  See Docket No. 61-18, p. 4.  The second piece of mail was a letter from the United States Department of Justice and was opened on or about October 30, 2006.  See Docket No. 61-19, p. 1.

It is important to note that simply because the NDSP's policy characterizes a type of correspondence as "privileged mail," this designation is not dispositive of whether the correspondence is "legal mail" which is constitutionally protected.  In other words, a prison's policy may be more generous to inmates than what the United States Supreme Court has defined as the minimal protections afforded to inmate's mail.  Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998).  In order to set forth a claim under 42 U.S.C. § 1983, an inmate must show a violation of his constitutional rights, not merely a violation of prison policy.  Gradner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997).  Thus, the difference between mail that is constitutionally protected and mail that is protected by the prison's policy is critical.  The former allows an inmate to proceed with a 42 U.S.C. § 1983 claim, and the latter may not.

The Court finds that the two pieces of correspondence opened by prison officials in August 2005 and October 2006 are not constitutionally protected mail under the definitions set forth by the United States Supreme Court and the Eighth Circuit Court of Appeals.  While correspondence from the Cass County District Court Judge's chambers and the United States Department of Justice may be defined as privileged correspondence under the NDSP policies, the Constitution does not afford protection for such items of mail received by an inmate.  Therefore, Moore cannot sustain a 42

U.S.C. § 1983 action based on the opening of such items of mail outside his presence.  The Court

finds that Moore's complaints regarding the opening of his mail on August 10, 2005 and October

30, 2006, are devoid of merit and fail as a matter of law.

Even if the Court were to determine that the letters constituted legal mail, Moore's claim

would still fail.  The Eighth Circuit has held that an "isolated incident, without any evidence of

improper motive or resulting interference with [the inmate's] right to counsel or to access to the

courts, does not give rise to a constitutional violation."  Gardner v. Howard, 109 F. 3d 427, 430-

31(8th Cir. 1997).  The Court finds that Moore has failed to establish that the prison officials

involved in the inadvertent opening of two items of mail in August 2005 and October 2006 acted

with an improper motive or that Moore's right to counsel or access to the courts was interfered with

by the inadvertent opening of the two letters.  Thus, Moore's claims regarding the opening of the

letter from the Cass County District Court Judge's chambers and the United States Department of

Justice fail as a matter of law, even if the letters were considered to be "legal mail."

### 2)   TORN MAIL

Moore also contends that three pieces of mail were opened by prison employees, but then

goes on to state that the mail was opened by "tearing into the legal mail envelopes" and that the

"legal mail envelopes arrived torn."  See Docket No. 34, p. 6.  The first piece of torn mail was dated

March 10, 2006, and was from the Ramsey County District Court for the District of St. Paul,

Minnesota.  The second piece of torn mail was dated March 13, 2006, and was from the United

States Court of Appeals for the District of Columbia.  The third piece of torn mail was dated April

26, 2006, and was from the chambers of Judge Margaret M. Marrinan, United States District Court for the District of Minnesota.

Moore relies on the unsupported assertions that these three pieces of torn mail were opened by prison officials. The record reveals that Moore was repeatedly informed that the mail was received damaged and the prison officials verified that the mail had not been opened. Warden Schuetzle attested that all three pieces of mail that Moore contends were opened outside of his presence had nothing more than a torn envelope flap. See Affidavit of Schuetzle, Docket No. 61, ¶ 29.

To defeat summary judgment, a party must substantiate allegations with sufficient probative evidence that would allow finding in the party's favor based on more than just speculation. Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir.1994). Moore has failed to provide any evidence to support his assertion that these three pieces of mail were opened. The Court finds that Moore's complaints regarding the opening of his mail on March 10, 2006, March 13, 2006, and April 26, 2006, are devoid of merit and fail as a matter of law. However, even if a genuine issue of material fact existed as to whether Moore's mail was opened on these three occasions in March-April 2006, Moore's claims would nonetheless fail.

As discussed above, letters sent by the clerk of the district court, a district judge, and a magistrate judge and not marked confidential are not legal mail as defined by the United States Supreme Court or the Eighth Circuit Court of Appeals. Accordingly, the Court finds that even if Moore's mail had been opened by prison officials on March 10, 2006, March 13, 2006, and April 26, 2006, as Moore alleges, his rights were not violated because the mail was not constitutionally protected.

36

In summary, the Court expressly finds that Moore's claim that NDSP officials have violated his constitutional rights by opening his "legal mail" fail as a matter of law.  In reaching this conclusion, the Court does not condone the actions of the NDSP with respect to the mail that was inadvertently opened in August 2005 and October 2006.  It is clear from the record that the NDSP violated its own internal procedures for handling what it considers to be the "privileged mail" of inmates.  It is not difficult to see why Moore would become upset and frustrated with prison officials who open "privileged mail" outside of his presence.

## IV.   <u>CONCLUSION</u>

The Court has carefully and thoroughly reviewed the entire record.  There has been no competent, reliable evidence presented to support the claims of constitutional violations.  There are no genuine issues of material fact for trial and, as such, the Defendants are entitled to summary judgment as a matter of law.  The Defendant's amended Motion for Summary Judgment (Docket No. 70) is **GRANTED**.  The Plaintiff's Motion for Summary Judgment (Docket No. 34) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

Dated this 18th day of May, 2007.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court

37